UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
MIRIAN PENA, on behalf of
H.P., a minor child,

                     Plaintiff,

            -against-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                     Defendant.
----------------------------------------------------------------x

**MEMORANDUM & ORDER**

10-CV- 2619 (DLI)

**DORA L. IRIZARRY, United States District Judge:**

      Plaintiff Mirian Pena, on behalf of her minor son, H.P., filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("Act") on October 4, 2007. By a decision dated November 2, 2009, the Administrative Law Judge ("ALJ") concluded that plaintiff was not disabled within the meaning of the Act. On April 1, 2010, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. On June 8, 2010, plaintiff filed the instant action seeking judicial review of the denial of benefits. The Commissioner now moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking remand for further administrative proceedings. Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision and remand solely for the calculation of benefits.

      For the reasons set forth below, the Commissioner's motion is granted, the plaintiff's motion is denied, and the case is remanded to the Commissioner for further administrative proceedings consistent with this Memorandum and Order.

## BACKGROUND

**A.  Non-medical and Testimonial Evidence**

H.P. was born on October 4, 2000.  (A.R.[1] at 133.)  Plaintiff testified that H.P., at the age of ten months, banged himself on the head.  (A.R. at 52.)  At fourteen months, he would throw himself on the floor and hit himself on the head, and was not speaking at the age of two.  *Id.*  Sometime around the age of two, H.P was enrolled in an early intervention school.  (A.R. at 53.)  At the early intervention school, H.P. received speech and physical therapy, and could not walk well or grab things well.  *Id.*  H.P. would also leave the apartment while his mother slept.  (A.R. at 53.)  Plaintiff also testified that H.P. began taking medication in 2005, but plaintiff stopped administering the medication when someone told her that the medication was not good for the child.  (A.R. at 55.)  The medication was resumed sometime in 2008, and when medicated, H.P. was more tranquil and easier to manage.  (A.R. at 55.)  H.P.'s mother testified that, as a result of the medication, his grades and behavior also improved, but not yet to an acceptable level.  *Id.*  At school, H.P. would throw papers at other students as well as bang on their desks.  (A.R. at 56.)  At home, H.P. could bathe and play with other children in the street outside, but only when supervised by his mother.  (A.R. at 57-58.)  Plaintiff also testified that H.P. had trouble sleeping and wet the bed each night.  (A.R. at 63.)

At the hearing before the ALJ, H.P. testified that school was "good" and that he did not have arguments with other children.  A.R. at 87-88.  When asked if he still pushed others to be first in line, he responded, "I don't do that anymore."  A.R. at 88.  H.P. indicated that he did his homework, and generally followed the teacher's directions.  A.R. at 89.

---

[1] "A.R." refers to the administrative record.

An Individualized Education Program (IEP) dated April 26, 2007 indicated a speech impairment with receptive and expressive language delays. (A.R. at 223.) H.P. could ask and answer questions using simple and complex sentences, but his language production did not demonstrate mastery of syntactical rules that are "typically used by children his age." *Id.* H.P. could follow one- and two-step directives, but showed deficits in semantics and vocabulary, inconsistently responded to wh- questions, and had difficulty with metalinguistic tasks such as problem solving and making inferences. (A.R. at 223.) H.P. also was described as a "friendly, happy, and energetic child." (A.R. at 224.) A second IEP dated April 17, 2008, noted that H.P. had made progress since the beginning of that school year and showed ability to improve in all language areas. (A.R. at 290.) His behavior was noted to have improved, but he still showed signs of social immaturity. (A.R. at 291.) The 2008 IEP recommended that H.P.'s speech therapy continue. No behavior intervention plan was required. *Id.*

H.P.'s teacher, Ms. Almonte, completed a teacher questionnaire on December 18, 2007. (A.R. at 165-72.) Ms. Almonte indicated that H.P. had an obvious problem waiting to take turns and was rather impulsive. (A.R. at 167.) She also indicated that H.P had an obvious problem expressing anger appropriately. (A.R. at 168.) Ms. Almonte noted no problem in maneuvering around the classroom and manipulating objects. (A.R. at 169.) H.P. had serious problems with being patient, identifying and appropriately asserting emotional needs, and responding appropriately to changes in his own mood. (A.R. at 170.) Finally, Ms. Almonte described H.P. as a sweet boy who loved to read, enjoyed being in school, and got along well with his classmates, though noting problems with releasing his frustration appropriately. (A.R. at 172.)

**B.     Medical and Psychiatric Evidence**

Evidence from school-based specialists, treating doctors, and consulting doctors was entered into the administrative record. On July 31, 2003, H.P. was evaluated by Maria Kober, a bilingual speech language pathologist. (A.R. at 244.) On the Auditory Comprehension section of the Preschool Language Scale-4, H.P. received a standard score of 84, indicating receptive language skills to be borderline within the mean to mildly delayed. (A.R. at 245.) On the Expressive Communication section of the same test, H.P. revceived a standard score of 69, indicating expressive language skills to be moderately to severely delayed and two standard deviations below the mean. (A.R. at 246.) Speech language therapy was recommended. (A.R. at 247.)

On August 5, 2003, H.P. received a bilingual educational evaluation from Ana Wegmann, M.S. Spec. Ed. (A.R. at 248-49.) H.P. was found to have delays in the areas of cognitive (28% delay) and fine motor skills (25%), with significant delays in speech and language skills (33%). *Id.* H.P. was recommended to receive structured bilingual education with large and small group activities, as well as individual assistance in areas of delay. (A.R. at 249.)

Irene Giusti, Ph.D., prepared a bilingual psycho-educational evaluation on September 3, 2003. (A.R. at 250-54.) During observations of H.P. at school, Dr. Giusti noted that H.P.'s verbal comprehension was very low, he had a slow reaction time, and appeared to be lethargic. (A.R. at 250.) The Bayley Scales of Infant Development showed that H.P. had a mental age similar to a 22-month-old child, placing him in the low range for his age. (A.R. at 251.) On the Vineland Adaptive Scales test, H.P.'s interpersonal relationships score (part of the socialization domain) was the equivalent of a ten-month-old child. (A.R. at 252.) H.P.'s coping skills score (also part of the socialization domain) was the equivalent of an eleven-month-old child. *Id.*

H.P.'s motor skills domain scores were adequate, but his scores in the communication, daily living skills, and socialization domains were either low or moderately low. *Id.* Dr. Giusti recommended educational services in light of H.P.'s severe cognitive delays. (A.R. at 253.)

Sometime in 2005, H.P. was diagnosed with ADHD by the National Pediatric Center and prescribed Adderall and Risperdal. (A.R. at 299.) On January 7, 2005, psychologist Angel O. Flores completed a psycho-educational evaluation. On the WPPSI-III test, H.P. received a full scale IQ in the mental deficient range, though Dr. Flores noted that it was difficult to assess H.P.'s true abilities due to his behavior during the evaluation. (A.R. at 240-41.) H.P.'s verbal IQ was borderline, his performance IQ was deficient, and his processing speed IQ was borderline. (A.R. at 241.) Dr. Flores described H.P. as an "active, distracted, impulsive, and immature boy who demonstrated poor control over his impulses." (A.R. at 242.) The final recommendation was for a small-structured classroom environment to meet H.P.'s behavioral needs. (A.R. at 243.)

Elaine Bernabe, M.S., completed a speech-language annual progress note on January 24, 2005. (A.R. at 236-38.) H.P. had made significant progress in terms of his play skills and showed a noted increase in his vocabulary. (A.R. at 236-37.) However, H.P. still had difficulty following complex directions and in relaying what to do in different situations. *Id.* Receptive language skills were delayed and ranged from the 36- to 42-month level. (A.R. at 237.) Expressive language skills were also delayed, assessed at the 30- to 36-month level. *Id.*

Mirian Olaechea completed an annual education progress note on February 1, 2005. (A.R. at 234-35.) At the age of 51 months, H.P. was performing at approximately the 36-month level with emerging skills. (A.R. at 234.) After long breaks from school, H.P. would have greater difficulty relating with peers, sometimes screaming at them. (A.R. at 235.) H.P. had made steady progress, but required adult supervision and intervention and would continue to benefit from a

5

special class setting. (A.R. at 235.)

After the initial application for benefits, Sheila Bernstein, a speech-language pathologist, completed a bilingual speech-language evaluation on January 30, 2008. (A.R. at 273-75.) After administering the TOLD-4-P, Bernstein noted that H.P. displayed below average results on the picture vocabulary, relational vocabulary, syntactic understanding, and morphological completion subtests. (A.R. at 275.) H.P.'s scores were average on the oral vocabulary and sentence imitation subtests. *Id.* All of H.P. scores on the composites (listening, organizing, speaking, grammar, semantics, spoken language) were below average. *Id.* H.P. presented with a moderate-severe delay in language development with overall communication skills at the 5 ½ year level. *Id.* H.P. did not demonstrate skills in Spanish. *Id.*

On January 31, 2008. Kenneth Cochrane, Ph.D., conducted a consultative child non-verbal intelligence evaluation. (A.R. 262-65.) Dr. Cochrane noted that H.P. was uncooperative and anxious during the evaluation, working impulsively and rapidly. (A.R. at 263.) Dr. Cochrane administered the TONI-3 standardized non-verbal intelligence measure, resulting in a score of 70 within the mildly mentally retarded range. *Id.* H.P. was unable to dress, bathe, and groom himself, and spent his days playing mostly alone. *Id.* The report noted many deficiencies in H.P.'s ability to interact with others, including problems following directions, completing age-appropriate tasks, requesting assistance, and interacting with peers and adults. (A.R. at 264.) Dr. Cochrane recommended that H.P. continue psychological and psychiatric treatment but that his medication should be reexamined and possibly recalculated. *Id.* Dr. Cochrane's final diagnosis consisted of attention deficit hyperactivity disorder, cognitive disorder NOS, and mild mental retardation. *Id.*

On February 20, 2008, Alan Dubro, Ph.D., performed a consultative psychiatric

evaluation. (A.R. at 268-72.) During the exam, H.P. was cooperative and demonstrated fluent and clear speech without hyperactive behavior or lack of eye contact. (A.R. at 270.) Dr. Dubro also noted that H.P.'s attention, concentration, and memory skills were intact. *Id.* H.P.'s mother reported that H.P. could dress, bathe, and groom himself in an age-appropriate manner. (A.R. at 271.) H.P. had difficulty maintaining appropriate social behavior at home, but this was not present at school. *Id.* Dr. Dubro diagnosed H.P. with disruptive behavior disorder not otherwise specified and borderline cognitive functioning. *Id.* H.P.'s prognosis was fair. *Id.*

State agency psychiatrist Dr. Hou and speech language pathology specialist M. Lieberman reviewed the record and completed a Childhood Disability Evaluation Form based on a "cold read" of the file on March 11, 2008. (A.R. at 280-85.) They indicated that H.P.'s impairments were disruptive behavior disorder, learning disability, mild mental retardation, and speech-language delay. (A.R. at 280.) They also indicated that these impairments were severe but did not meet, medically equal, or functionally equal the listings. *Id.* They found that H.P. had marked limitation in the domain of acquiring and using information, less than marked limitations in the domains of attending and completing tasks, interacting and relating with others, caring for yourself, and health and physical well-being, and no limitation in the domain of moving about and manipulating objects. (A.R. at 282-83.)

H.P. was again prescribed medication in 2009 by the National Pediatric Center, this time Focalin and Risperdal. (A.R. at 299, 303.) On July 28, 2009, Dr. Fermin Gonzalez of the National Pediatric Center completed a child's mental and physical impairment evaluation. (A.R. at 302-05.) Dr. Gonzalez indicated that H.P. displayed marked limitations in personal/behavioral function; limitation of concentration, persistence, or pace; limitations of fine motor functions; and limitations of gross motor function. (A.R. 304-05.) H.P. displayed moderate limitations of

cognitive/communicative functioning and social functioning. *Id.* Dr. Gonzalez' conclusions in this report were not supported by additional documentation, though the ALJ had requested it prior to the hearing. (A.R. 195-97.)

On July 25, 2009, Carmen Jimenez of Counseling Consultation Services prepared a letter summarizing H.P.'s counseling treatment at their center. (A.R. 306-07.) After being referred by a school counselor in April 2008, H.P. was diagnosed with separation anxiety disorder and attention deficit hyperactivity disorder. (A.R. at 307.) As a result, H.P. received interactive therapy and cognitive behavioral therapy. *Id.*

At the hearing before the ALJ on July 29, 2009, Dr. Alvin P. Goldstein, a pediatrician, testified as the medical expert. (A.R. at 66-91, 129-30.) After reviewing the record, Dr. Goldstein diagnosed H.P. with attention deficit disorder, mild mental retardation, learning disability, and possibly oppositional defiance disorder. (A.R. at 69.) Dr. Goldstein concluded that H.P. did not meet or medically equal the listing impairments. *Id.* Dr. Goldstein's reasoning included the fact that H.P. had never been hospitalized and that medication, when taken, improved his behavior and relationships. (A.R. at 70.) H.P. was assessed to have less than marked limitations in the domains acquiring and using information, attending and completing tasks, caring for yourself, and health and physical wellbeing. (A.R. at 76-77.) H.P. had marked limitations in the domain of interacting and relating with others and no limitation in the domain of moving about and manipulating objects. (A.R. at 76.) When asked about the conflicting evidence in the examinations from Dr. Cochrane and Dr. Dubro, Dr. Goldstein stated that "you don't know whether they're talking about the same child."

# DISCUSSION

**A.     Standard of Review**

This Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, the Court need not determine de novo whether a claimant is disabled. *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Rather, the Court's inquiry is limited to the question of whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) ("Substantial evidence 'is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"); *Lamay v. Astrue*, 562 F.3d 503, 507 (2d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "[T]o determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). Moreover, "[e]ven when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'" *Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009) (quoting *Lamay*, 562 F.3d at 508-09). Therefore, the court must be satisfied "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Id.* at 112 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d

Cir. 1990)). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Remand for calculation of benefits is "appropriate when the existing record compels the conclusion that the plaintiff is disabled." *Ali v. Astrue*, No. 09-CV-2123, 2010 WL 889550 at *4 (E.D.N.Y. Mar. 8, 2010).

B.  **SSA Regulations Defining Childhood Disability**

To qualify for SSI benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004). The SSA has provided a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of disability. 20 C.F.R. § 416.924(a); *see also Pollard*, 377 F.3d at 189. First, the ALJ must consider whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). "Second, the ALJ considers whether the child has a medically determinable impairment that is severe, 'which is defined as an impairment that causes more than minimal functional limitations.'" *Pollard*, 377 F.3d at 189 (quoting 20 C.F.R. § 416.924(c)). Third, "if the ALJ finds a severe impairment, he or she must then consider whether the impairment medically equals' or ... functionally equals 'a disability listed in the regulatory Listing of Impairments.'" *Id.* (quoting 20 C.F.R. § 416.924(c), (d)).

Under the third step, a claimant can demonstrate functional equivalence to a Listing impairment by exhibiting "marked" limitations in two of six domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). These six domains consider a child's: (1) ability to acquire and use information; (2) ability to attend and complete tasks; (3) ability to interact and

relate with others; (4) ability to move about and manipulate objects; (5) ability to care for oneself; and (6) health and physical well-being. 20 C.F.R. §§ 416.926a(a)-(b). A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (quoting 20 C.F.R. § 416.926a(e)(2)(i)). In addition, the regulations provide that a limitation is "marked" when standardized testing shows functioning two standard deviations below mean levels. *Id.; see also Pacheco v. Barnhart*, 2004 WL 1345030, at *4 (E.D.N.Y. Jun. 14, 2004). An "extreme" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation would be found in a domain where the child scores at least three standard deviations below average. *Id.*

C.   **ALJ's Decision**

The ALJ applied the three-step analysis set forth in 20 C.F.R. § 416.924(a) to evaluate H.P.'s claim. The ALJ resolved step one in plaintiff's favor, since H.P. had not engaged in substantial gainful activity. (A.R. at 16.) At step two, the ALJ found that H.P. had severe impairments of "learning disability, speech delay, attention deficit hyperactivity disorder (ADHD), borderline intellectual functioning and behavior problems." *Id.* The ALJ resolved step three against the plaintiff, finding that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, and consequently, that H.P. was not disabled.

D.   **Application**

The Commissioner seeks remand, contending that the ALJ failed to consider the validity of the IQ test performed by Dr. Cochrane, and that the gaps in the record prevented the ALJ from

11

reaching a valid conclusion. Plaintiff opposes the motion and moves for remand solely for calculation of benefits, contending that the record compels a finding of disability and that remand for further development of the record is unnecessary.

### 1. The ALJ Erred by Not Considering the Validity of the IQ Test

At step three, the ALJ first applied the record to the Listing of Impairments §112.05(E) for mental retardation. 20 C.F.R. § 404 Subpart P Appendix 1 112.05(E). Section 112.05(E) requires a valid verbal, performance, or full scale IQ of 60 through 70, resulting in impairments listed in at least one of paragraphs B2b (marked impairment in age-appropriate social functioning), B2c (marked impairment in age-appropriate personal functioning), or B2d (marked difficulties in maintaining concentration, persistence, or pace), of §112.02. When evaluating the factors of §112.05(E), the ALJ's decision considered whether Dr. Cochrane's findings were consistent with the rest of the record, but did not directly consider whether the IQ score of 70 was valid. (A.R. at 29.) The relevant standards for assessing an IQ score are found in 20 C.F.R. § 404 Subpart P Appendix 1, 112.00(D)(8):

> 8. The salient characteristics of a good test are: (1) Validity, *i.e.,* the test measures what it is supposed to measure; (2) reliability, *i.e.,* the consistency of results obtained over time with the same test and the same individual; (3) appropriate normative data, *i.e.,* individual test scores can be compared to test data from other individuals or groups of a similar nature, representative of that population; and (4) wide scope of measurement, *i.e.,* the test should measure a broad range of facets/aspects of the domain being assessed. In considering the validity of a test result, we should note and resolve any discrepancies between formal test results and the child's customary behavior and daily activities.

A proper evaluation of an IQ score follows the requirements found in § 112.00(D)(8) and "compare[s] the testing scores available, resolve[s] conflicts in the evidence, and examine[s] the scores in connection with other relevant information in the record." *Doyle v. Astrue*, 2011 WL 1706956, at *10 (D.S.C. May 5, 2011). The standards in 112.00(D)(8) specifically require an

ALJ to "note and resolve any discrepancies between formal test results and the child's customary behavior and daily activities." 20 C.F.R. § 404 Subpart P Appendix 1, 112.00(D)(8). In the case at bar, the ALJ met none of these requirements. By not considering whether the IQ score was valid, the ALJ committed legal error and remand is proper.

Plaintiff seeks remand solely for the calculation of benefits, and claims that an evaluation by the ALJ of the IQ test upon remand is unnecessary since the IQ score is valid "when the clear regulations on assessing validity of IQ scores are applied." (Pl.'s Mem. at 23.) Remand for calculation of benefits is "appropriate when the existing record compels the conclusion that the plaintiff is disabled." *Ali v. Astrue*, 2010 WL 889550, at *4 (E.D.N.Y. Mar. 8, 2010). The Commissioner presents a compelling argument for the existence of discrepancies between H.P.'s customary behavior and the test results, as well as questioning the validity of the test results based on H.P.'s behavior during the test. (Def.'s Mem. at 19-22.) In short, there is evidence in the record that casts doubt on the IQ score's validity, and thus the existing record does not "compel" a conclusion of disability. *See Pereira v. Astrue*, 2010 WL 2091716, at *9 (E.D.N.Y. May 25, 2010) ("On this record . . . . the facts could support a conclusion of either disabled or not disabled. Accordingly, the case is remanded to allow the ALJ to reweigh the evidence, developing the record as needed.").

Additionally, plaintiff argues that H.P. is mentally retarded under § 112.05(D) of the Listing of Impairments, which requires that claimant show an IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function. Plaintiff cites H.P.'s ADHD as the mental impairment that meets this requirement. (Pl.'s Mem. at 20 n. 1). In response, the Commissioner again notes correctly that neither the requirements of § 112.05(D) nor § 112.05(E) can be met without a valid IQ score, which the ALJ failed to evaluate

13

below. (Def.'s Reply Mem. at 2). Accordingly, the case must still be remanded to determine the validity of the IQ score.

## 2. The Record Does Not Compel a Finding of Disability Based on Marked Limitations in Two of the Six Domains

The ALJ also considered the six domains found in 20 C.F.R. § 416.924(d) and 416.926(a) to determine whether H.P. had an impairment or combination of impairments that functionally equaled the listings. H.P. was found to have a marked limitation in the domain of interacting and relating with others. (A.R. at 36). The ALJ also determined that H.P. had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, caring for yourself, health and physical well-being, and no limitations in the domain of moving and manipulating objects. (A.R. 30-43). As a result, H.P. did not have an impairment or combination of impairments that functionally equaled the listings. (A.R. at 43).

Plaintiff argues that H.P. has marked limitations in at least three functional domains – the domain of interacting and relating with others (found by the ALJ and conceded by the defendant), as well as the domain of acquiring and using information, and the domain of attending and completing tasks, which functionally equal a listed impairment. (Pl.'s Mem. at 20.) Regarding acquiring and using information, the Commissioner persuasively notes that the incomplete education record[2] prevents a decisive finding of a marked limitation (or lack thereof) in this domain. Moreover, some of the evidence in the record supports the finding of a less than marked

---

[2] On remand, the ALJ should complete the record, which has gaps from 2007 to 2009, notably lacking updated IEPs, report cards, teacher comments, and Dr. Gonzalez' treatment notes. *See Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (thirteen-month gap and missing treating notes from doctor were enough for remand). This court notes that Dr. Gonzalez' treating notes, when added to the record, could affect the weight given to Dr. Gonzalez' opinion as a treating physician. If Dr. Gonzalez' opinion is given greater weight, Dr. Cochrane (and the IQ score) may no longer be the outlier in the record.

limitation in the domain of acquiring and using information, including a report from H.P.'s teacher that he had few problems completing tasks, and H.P.'s score on an English-as-a-second-language exam that no longer requires him to receive bilingual education. (A.R. at 31-33, 167, 288). In short, the record does not "compel" a finding for or against a marked limitation in this domain, and remand is appropriate.

Nor is a finding of marked limitations compelled in the domain of attending and completing tasks. (A.R. at 34-35.) Plaintiff notes that both Dr. Cochrane and Dr. Bernstein found that H.P. was highly distracted and had a short attention span. (Pl.'s Mem. at 23, n. 1). However, less than a month after these examinations, Dr. Dubro found that H.P. was able to follow and understand age-appropriate directions, and could complete age-appropriate tasks. (A.R. at 271). The Commissioner also notes that H.P.'s teacher, Ms. Almonte, assessed that H.P. had no serious problems in this domain. (Def.'s Mem. at 23). Thus, the record does not "compel" a finding for or against a marked limitation in this domain.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion is granted, the plaintiff's motion is denied, and the case is remanded, pursuant to the fourth sentence of 42 U.S.C. § 405(g), to the Commissioner to consider the validity of the IQ test administered by Dr. Cochrane, and complete the record, which has gaps from 2007 to 2009.

SO ORDERED

DATED: Brooklyn, New York
        July 7, 2011

_____/s/_____
DORA L. IRIZARRY
United States District Judge